IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **99-cv-1711-JLK**

**ENERGY ACQUISITION CORP., a Colorado corporation; MICHIGAN
EXPLORATION, INC., a Michigan corporation; MICHIGAN PRODUCTION
COMPANY, L.L.C., a Michigan limited liability company; and MICHIGAN ENERGY
COMPANY, a Michigan limited liability company,**

        Plaintiffs and Counter-Defendants,

v.

**MILLENNIUM ENERGY FUND, L.L.C., a Delaware limited partnership; WILLIAMS
POWER COMPANY, INC. f/k/a Williams Energy Marketing & Trading Company, a
Delaware corporation; and SPV, L.L.C., an Oklahoma limited liability company,**

        Defendants and Counter-Plaintiffs, and
        Third-Party Plaintiff,

v.

**DWAIN M. IMMEL, an individual,**

        Third-Party Defendant.

---

## ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

---

        The parties in this action assert claims, counterclaims and third-party claims against each

other arising out of their involvement in the acquisition, development and operation of certain oil

and gas properties in Michigan.  Plaintiffs and Defendants have each brought motions for partial

summary judgment against a key set of their adversaries' claims.  For the reasons set forth

below, I grant Defendants' motion for partial summary judgment and deny Plaintiffs' motion.

### **Background**

        Unless otherwise stated the following facts are undisputed:

        Plaintiffs Michigan Production Company (MPC), Michigan Exploration, Inc. (MEI) and

Michigan Energy Company (MEC) are Michigan corporations or limited liability companies

whose businesses include exploration, development and/or operation of oil and gas properties in

Michigan. Plaintiff Energy Acquisition Company (EAC) is a Colorado corporation that acts as a holding company to own and control MPC and MEC. Defendants allege Third-Party Defendant Dwain M. Immel owns, either directly or indirectly, a controlling interest in each Plaintiff entity and has exercised control over these entities.

<u>The April 1997 Transaction</u>

On April 9, 1997, MPC entered into a number of written agreements with Williams Energy Services Company (Williams) relating to certain oil and natural gas wells in Michigan owned by MPC (the Michigan Properties). I will refer to these agreements as the April 1997 Transaction or simply the Transaction. 1.

A. VPP Agreements

The central feature of the April 1997 Transaction was Williams' agreement to provide $31.5 million in funding to MPC in return for MPC's conveyance to Williams of specified volumetric production payments (VPPs) from anticipated oil and natural gas production from MPC's Michigan Properties. This part of the Transaction was documented in three written agreements collectively referred to as the VPP Agreements.

In return for Williams' $31.5 million payment, the VPP Agreements required MPC to develop and operate the Michigan Properties, at no cost to Williams, as necessary to produce and deliver to Williams the specified quantity of oil and gas over a six-year period according to monthly schedules incorporated in the Agreements. If MPC did not meet its production payment obligation in any month, then the market price of the volume shortfall was recorded in a "Make-Whole Balance" account that accrued interest. The Agreements provided MPC's production payment obligations continued until MPC had produced and paid Williams the total quantity of oil and gas specified in the VPP Agreements, including any amounts necessary to reduce the Make-Whole Balance to zero.

The VPP Agreements specified that MPC was responsible for all costs and expenses incurred in exploring, developing and operating the Michigan Properties to produce the quantities of oil and gas necessary to make the required VPP payments to Williams. In particular, the VPP Agreements required MPC, among other things, to take all actions that a prudent operator would deem necessary with respect to these Properties; to operate and maintain them in conformity with all applicable laws, leases and contracts; to pay promptly all costs and expenses incurred in exploring, developing, operating and maintaining them; and to pay all royalties due on production from them fully and on time. In addition, MPC warranted, among other things, that it owned good title to the Michigan Properties, free of all liens, security interests, encumbrances or other burdens, and that it had operated, maintained and developed them in a good and workmanlike manner, in accordance with prudent industry standards.

If MPC failed to discharge its operation and production obligations under the VPP Agreements, the Agreements authorized Williams to step in to perform these obligations in order to protect its $31.5 million investment in the oil and gas to be produced from these properties. If Williams exercised its option to take over operation of the Michigan Properties, the VPP Agreements provided that any costs or expenses incurred by Williams in performing MPC's operating and other obligations under the VPP Agreements, plus interest, were "demand obligations" to be repaid by MPC to Williams.

B.      Escrow Agreement for Construction of Claybanks Extension

At the time of the April 1997 Transaction, the Michigan Properties lacked various pipelines, gathering lines and associated production facilities necessary to produce oil and gas from them. Pursuant to a separate Escrow Deposit Agreement (Escrow Agreement), executed in conjunction with the VPP Agreements, Williams placed $5 million of the $31.5 million in funding it was providing to MPC in an escrow account to serve as a source of funding for

construction of the necessary "Claybanks Extension" and as security for MPC's construction of the Extension. In a subsequent letter agreement, executed on November 21, 1997, the parties clarified that the Claybanks Extension referenced in the Escrow Agreement included a pipeline and all associated gathering lines and central production facilities. The Escrow Agreement provided that it would terminate upon completion of the Claybanks Extension to Williams' sole reasonable satisfaction and elimination of certain debts owing from MPC; upon MPC demonstrating to Williams' satisfaction that it had obtained alternate means to fully finance construction of the Extension; or upon joint written agreement of the parties, whichever occurred first. At the time of the April 1997 Transaction, the parties anticipated that the Claybanks Extension would be completed by October, 1997, and that full production from the Michigan Properties would begin at this time.

C.      Performance Guaranty

The April 1997 Transaction also included a Performance Guaranty, in which EAC and MEC guaranteed MPC's performance under the VPP Agreements. The Performance Guaranty provided that EAC's and MEC's obligations as guarantors would not be released or diminished by any act or omission by Williams concerning MPC's obligations under the VPP Agreements.

D.      Williams' Assignment to Millennium

On June 30, 1997, with MPC's consent, Williams assigned all of its rights, title and interests under the VPP Agreements, Escrow Agreement and Performance Guaranty to Millennium. Millenium then retained Williams, pursuant to a management and marketing agreement, to provide Millennium with management services relating to its dealings with MPC. Williams subsequently changed its name to Williams Energy Marketing & Trading Company, and then to Williams Power Company, Inc. I will continue to refer to this entity as "Williams" in this opinion.

<u>MPC's Performance under the VPP Agreements</u>

It is undisputed that MPC had difficulty performing its obligations under the VPP Agreements very shortly after it entered into them. MPC, for example, failed to make royalty payments or pay severance taxes on a timely basis, failed to pay vendors for debts relating to the Michigan Properties as they came due, had its title to some of these properties challenged and was forced to shut down several of the wells and facilities subject to the VPP Agreements because of health, safety and regulatory concerns. In addition, the Claybanks Extension was not completed by October 1997 as planned, but rather was completed sometime in the second half of 1998 or later. As a result of this delay, the unwillingness of MPC's vendors to perform field services when they had not been paid and other mechanical, operational and financial issues, MPC failed to produce and deliver to Millennium the volumes of oil and natural gas required by the VPP Agreements beginning in November 1997, and continuing through all periods relevant to this suit.

<u>Credit Agreement and Promissory Note</u>

MPC's struggle to meet its ongoing financial and other obligations to operate the Michigan Properties in compliance with the VPP Agreements led it to seek additional operating funds from Millennium a few months after it entered into the April 1997 Transaction. In October 1997, the parties' negotiations resulted in MPC and MEI entering into a written Credit Agreement with Millennium that authorized MPC essentially to borrow up to $2.3 million from the Claybanks Extension escrow account to pay for specified MPC operating expenses for the Michigan Properties. Pursuant to the Credit Agreement, MPC and MEI also entered into a Promissory Note that memorialized their obligation to repay Millennium for any funds MPC borrowed from the escrow account.

To secure the Credit Agreement and the Promissory Note, MEI granted Millennium a first mortgage on several oil and gas properties, the Rood and Nyman wells, in which it had an interest. The Credit Agreement required Millennium to release the Rood and Nyman mortgage upon MPC and MEI's payment in full of all obligations under the Credit Agreement and Promissory Note or termination of the Escrow Agreement in accordance with its terms.

MPC ultimately borrowed approximately $1.4 million from the escrow account pursuant to the Credit Agreement, and these funds became an obligation to be repaid under the Promissory Note.[1] It is undisputed that a portion of these borrowed funds were diverted by MPC or affiliated companies and individuals for uses other than operation of the Michigan Properties and/or for uses that were not authorized by the parties' agreements. It is also undisputed that as of July 31, 1998, MPC and MEI had made only two of the monthly payments required by the Credit Agreement and Promissory Note.

<u>October 1998 and April 1999 Letter Agreements</u>

Even with the monies advanced to it under the Credit Agreement, MPC continued to experience difficulties in meeting its operating and production obligations with respect to the Michigan Properties. As a result, MPC was not able to make the oil and gas volumetric production payments to Millennium required by the VPP Agreements.

In an effort to protect its investment in these production payments, in April 1998 Millennium began providing additional funding to MPC and its vendors to pay for operating and other costs relating to the Michigan Properties. Millennium recorded these payments as "demand obligations" to be repaid by MPC as provided in the VPP Agreements.

---

[1] Plaintiffs deny that $1.4 million is the amount MPC borrowed and used for purposes other than construction of the Claybanks Extension, but the evidence they cite as disputing this fact, a statement by Mr. Immel in his April 18, 2001 affidavit, does not address non-construction costs. *See* Pls.' Br. in Opp. to Defs.' Mot. (Doc. 112) at 8 (citing Immel Aff. (Doc. 114), ¶ 14).

By October 1998, MPC's financial situation had deteriorated to the point that Millennium exercised its right under the VPP Agreements to take over operation of the Michigan Properties. To effect this transfer of responsibility, on October 13, 1998, MPC, EAC and Millennium entered into a detailed letter agreement (the October 1998 Letter Agreement).  Under this agreement, MPC agreed to transfer the Michigan Properties to a new limited liability company to be created and held primarily by Millennium.  The October 1998 Agreement further provided that Millennium would arrange for the operation, management and administration of the Michigan Properties by a third party "until such time when Millennium has recovered all of the volumes to which Millennium is entitled under the VPPs, including without limitation . . . volumes necessary to reduce the 'Make Whole Balance' and the demand obligations to zero." Exs. 30-90 to Defs.' Br. in Support of Mot. for Partial Summ. J. (Doc. 106), Ex. 32 [October 1998 Letter Agreement] at 1.  Consistent with the VPP Agreement, the parties agreed that all expenses the third party manager or Millennium incurred in operating and managing the Michigan Properties in place of MPC, as well as their payment of MPC's existing liabilities with respect to these properties, would be funded by Millennium as "demand obligations" under the VPP Agreements.  *Id.* at 1, 2.

The October 1998 Agreement also granted Millennium the right to sell the Michigan Properties at any time, with the sale proceeds allocated "so that Millennium shall be made whole for all amounts that would have been due under the VPPs."  *Id.* at 3.  MEI was granted a right of first refusal on a sale as long as it satisfied certain conditions.  In addition, the October 1998 Letter Agreement granted MEI the right to repurchase the Michigan Properties from the new LLC for $1 if and when the VPP Agreements terminated.  The parties agree the VPP Agreements would terminate under their terms when all MPC production and repayment obligations under the Agreements had been satisfied.

Millennium subsequently formed Defendant SPV, LLC to hold the Michigan Properties as provided in the October 1998 Letter Agreement. Sometime in early 1999, it also selected a manager to operate these properties.

In late March 1999, as the date for transferring Michigan Properties operations to the new manager approached, Millennium asked MPC for written confirmation that it would transfer operation of the properties to the manager as provided in the October 1998 Letter Agreement. On April 1, 1999, this request resulted in MPC and Millennium entering into yet another letter agreement concerning the Michigan Properties (April 1999 Letter Agreement). In this agreement, MPC confirmed that Millennium had the right and responsibility under the October 1998 Letter Agreement to appoint a manager to operate the Michigan Properties and that all of the manager's expenses would be funded by Millennium as demand obligations. The April 1999 Letter Agreement further states, among other things, that as a term and condition of MPC transferring operations of the Properties to the third party manager selected by Millennium, "Millennium will assume and fund all of the MPC liabilities described on the attached Exhibit." The agreement concludes by stating that this and its other "terms and conditions are agreed and accepted by MPC, MEI, EAC, Millennium and Williams in accordance with the terms and conditions of the October 13, 1998 Letter Agreement." Immel Aff. (Doc. 100), Ex. 14 [April 1999 Letter Agreement].

Both before and after the April 1999 Letter Agreement was executed, Millenium sent MPC notices of its payment of the Michigan Properties' operating costs as demand obligations under the October 1998 Letter Agreement and the VPP Agreements. Millennium did not object to these notices or their description of this funding as demand obligations to be repaid by MPC pursuant to the VPP Agreements until after this litigation commenced.

Shortly after entering into the April 1999 Letter Agreement, Millennium provided MEI with a letter of intent regarding its proposed sale of the Michigan Properties to a third party. MEI attempted to exercise its right of first refusal under the October 1998 Letter Agreement, but Millennium rejected MEI's offer, stating it did not satisfy the conditions stated in the Letter Agreement.

<u>This Action</u>

On August 2, 1999, MEI, MPC and EAC filed this action against Millennium in Colorado state district court, asserting claims relating to Millennium's refusal to allow MEI to purchase the Michigan Properties under the right of first refusal provided in the October 1998 Letter Agreement. After Defendants removed the action to this court, Plaintiffs amended their complaint to add claims relating to a separate dispute over Millennium's defense of MPC in litigation brought by another party concerning one of the Michigan Properties ("West Shore Litigation").

In its Answer to the First Amended Complaint, Millennium denied Plaintiffs' claims and asserted counterclaims against Plaintiffs for: (1) breach of contract relating to Plaintiffs' respective obligations under the VPP Agreements, Performance Guaranty, Credit Agreement, Promissory Note and October 1998 Letter Agreement; (2) breach of fiduciary duty against MPC; (3) fraud against MPC, EAC and MEI as a result of alleged affirmative misrepresentations and concealment of material facts concerning the Michigan Properties; and (4) conversion of funds provided by Millennium for funding specified costs pertaining to the Michigan Properties. It also filed a third-party complaint against Dwain M. Immel, an alleged officer, director and/or shareholder in MPC, MEI and EAC, seeking to impose personal liability on him under an alter ego theory for the Plaintiff companies' alleged wrong-doing.

In subsequent amended complaints, Plaintiffs countered by naming Williams and SPV LLC as additional defendants and adding claims asserting that, by virtue of the October 1998 and April 1999 Letter Agreements, Millennium had assumed all of MPC's debts and obligations under the VPP Agreements, Performance Guaranty, Credit Agreement and Promissory Note, thereby extinguishing those debts and all of Defendants' obligations under those agreements. In addition, Defendants added a claim for tortious interference against Millennium and Williams relating to another dispute between the parties, arising from the so-called Hartland Transaction.

Hartland Transaction

In October 1997, six months after entering into the April 1997 Transaction with Williams, EAC negotiated a draft agreement to acquire certain oil and gas properties, known as the Hartland Properties, from Dominion/Southern Michigan, Inc. and Wolverine Gas & Oil, Inc. (collectively Dominion/Wolverine). At approximately the same time, EAC and/or its affiliated companies began negotiations with Midcoast Energy Resources, Inc. (Midcoast) to obtain financing to enable MEI to complete the proposed Hartland Properties transaction.

On July 10, 1998, MEI executed a Letter of Intent with Midcoast that set out the structure of a proposed transaction by which Midcoast would loan MEI $5.5 million for MEI's acquisition and development of the Hartland Properties. A significant portion of the collateral to be provided by MEI to secure this loan was a first lien in MEI's interests in the Rood and Nyman properties. The Letter of Intent provided that the proposed transaction would close no later than July 31, 1998, with the closing contingent, among other things, on Midcoast's Board of Directors approving the proposed transaction no later than that date.

When Midcoast and MEI executed the Letter of Intent, Millennium held the mortgage on the Rood and Nyman properties to secure the Promissory Note, which at that point was in default. Neither EAC nor MEI notified Midcoast of Millennium's lien on these properties.

Plaintiffs contend this omission was the result of Millennium giving it verbal assurances in early July that it would release the Rood and Nyman mortgage. Millennium denies it agreed to release the mortgage.

On July 24, Midcoast's Board of Directors considered the proposed Hartland Transaction and refused to approve it, based on concerns about EAC's financial condition, EAC's failure to provide financial information, outstanding title issues and EAC's failure to provide a corporate guarantee, among other issues. EAC continued to attempt to address these concerns as the July 31 closing date approached.

On the evening of July 29, less than two days before the scheduled closing of the Hartland Transaction, MPC and MEI notified Millennium that the Credit Agreement had terminated as of that date because "no Obligations as defined in the Credit Agreement are owing." Exs. 3-90 to Defs.' Br. in Support of Mot. for Partial Summ. J. (Doc. 106), Ex. 77. MPC and MEI further requested that Millennium immediately execute an attached document confirming that the Credit Agreement had terminated and that the collateral for MPC's and MEI's obligations under the Credit Agreement, the Rood and Nyman mortgage, was released. It is undisputed that as of this date, MPC had not repaid the loan from the Claybanks Extension escrow account as required by the Credit Agreement and the Promissory Note.

On July 30, before Millennium responded to MEI's request, Midcoast's Board of Directors again refused to fund the Hartland Transaction. In a follow-up letter sent the following afternoon, the closing date under the Midcoast-MEI Letter of Intent, Midcoast stated the Board's decision was based on numerous concerns, the most significant of which was whether MEI and EAC had the financial ability to repay the loan and perform their other loan obligations.

On July 31, after the Midcoast Board refused to fund the Hartland Transaction and notified EAC of the reasons for its decision, Millennium notified MEI that it would not terminate

the Credit Agreement or release the Rood and Nyman mortgage. Millennium also informed Midcoast at this time that it held a prior security interest on the Rood and Nyman properties. This was the first time Midcoast learned that a prior lien existed on these properties.

After the Hartland Transaction did not close on July 31 as provided in the Letter of Intent, Midcoast, EAC and MEI agreed to try to restructure their proposed transaction to satisfy the concerns of Midcoast's Board. Although they reached agreement on an alternate financial structure for the transaction, Midcoast terminated negotiations and withdrew from involvement with the Hartland Transaction on August 4 because MEI had failed to provide it with various items, including confirmation that Williams would release its lien on the Rood and Nyman properties.

Motions for Summary Judgment

The parties have filed cross-motions for partial summary judgment on several of the claims, counterclaims and defenses asserted in this action. Plaintiffs seek summary judgment on their request for a declaratory judgment that all of their obligations and debts to Millennium under the VPP Agreements, Performance Guaranty and related agreements were extinguished by the October 1998 and April 1999 Letter Agreements. On this same basis, they also request summary judgment against Defendants' counterclaims for breach of these contracts. Defendants, in turn, seek summary judgment on their breach of contract claims and Plaintiffs' debt extinguishment claim, on Plaintiffs' tortious interference claim relating to the Hartland Transaction and Defendants' counterclaim for declaratory judgment on this dispute and on Plaintiffs' claims against Williams.[2]

---

[2]     Defendants also requested that summary judgment be entered on their breach of fiduciary duty claim, but subsequently withdrew this request. *See* 11/13/06 Tr. (Doc. 184) at 63. Defendants' further request that summary judgment be entered against Plaintiffs' Eighth Claim for Relief, for rescission of the October 1998 and April 1999 Letter Agreements and assignment of the Michigan Properties to SPV, was mooted when Plaintiffs' withdrew this claim. *See* Pls.' Resp. to

**Standard of Review**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, I view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Simms v. Okla. ex rel. Dep't Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Although the movant must show the absence of a genuine issue of material fact, it need not negate the nonmovant's claim. *Id.* Once the movant carries this burden, the nonmovant cannot rest upon its pleadings, but "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant."[3] *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997).

When considering cross-motions for summary judgment on a claim or defense, I am "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir.

---

Defs.' Mot. for Partial Summ. J. (Doc. 112) at 23. Just before filing their summary judgment motions, the parties also stipulated to dismissal of Plaintiffs' First, Second and Third Claims for Relief, which concerned the parties' dispute regarding MEI's attempt to exercise its right of first refusal to purchase the Michigan Properties.

[3] Although not strictly relevant to the standard for reviewing these summary judgment motions, I also note that neither party has requested a jury trial. As a result, if this case proceeds to trial, any disputed issues of fact will be decided by this court rather than a jury.

1997).  In reviewing each cross-motion, I must construe all inferences in favor of the party against whom the motion under consideration is made.  *Pirkheim v. First Unum Life Ins. Co.*, 229 F.3d 1008, 1010 (10th Cir. 2000).

### Discussion

I.      Claims Relating to the VPP and Other Agreements

In its first five counterclaims, Millennium seeks damages from MPC for breach of the VPP Agreements, from EAC and MEC for breach of the Performance Guaranty and from MPC and MEI for breach of the Credit Agreement and Promissory Note.  Plaintiffs do not deny that they breached each of these agreements, and under the undisputed facts there is no question that breach occurred.[4]  Plaintiffs assert, however, that their breach of contract is of no consequence because Millennium assumed all of MPC's debts under the VPP and related agreements by virtue of the October 1998 and April 1999 Letter Agreements.  This assumption of MPC's debts, Plaintiffs argue further, acted to extinguish these debts, and therefore is a complete defense to each breach of contract counterclaim.  On this same basis, Plaintiffs also cross-move for entry of summary judgment on their Fourth Claim for Relief for declaratory judgment that Millennium assumed and thereby extinguished all of Plaintiffs' debts and obligations under the VPP Agreements, the Performance Guaranty and the Escrow Agreement, as well as any other debt owed by Plaintiffs to Millennium and/or Williams.

A.      Breach of the VPP Agreements

Plaintiffs' defense to MPC's breach of the VPP Agreements turns on the interpretation of the October 1998 and April 1999 Letter Agreements.  The parties agree that under the express

---

[4]      For example, there is no dispute that MPC failed to deliver the volumes of oil and gas to Millennium required by the VPP Agreements, failed to pay the costs of operating and maintaining the Michigan Properties or repay Millennium for these costs, breached its warranties regarding good title and other matters relating to the Properties, and failed to make payments under the Promissory Note and the Credit Agreement.

terms of the Agreements, they are to be construed in accordance with Oklahoma law.  Under

Oklahoma law, "[a] contract must be so interpreted as to give effect to the mutual intention of

the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."

15 Okla. Stat. § 152; *Prudential Ins. Co. v. Glass*, 959 P.2d 586, 594 (Okla. 1998).  Determining

the parties' intent is a question of law to be decided by the court based solely on the language of

the contract unless the court determines the contract is ambiguous.  *Prudential*, 959 P.2d at 594;

*Lewis v. SAC & Fox Tribe of Okla. Housing Auth.*, 896 P.2d 503, 514 (Okla. 1994).  In

interpreting a contract, "[t]he whole of a contract is to be taken together, so as to give effect to

every part, if reasonably practicable, each clause helping to interpret the others."  15 Okla.

Stat. § 157.

The clear and unambiguous language of the October 1998 Letter Agreement does not

support Plaintiffs' contention that the parties intended by this agreement to extinguish MPC's

debts under the VPP Agreements.  First, there is simply no language in the Letter Agreement that

states this intent or from which it can be inferred.  Even the term "assume" upon which Plaintiffs

place so much reliance, does not appear in this agreement.

Second, the October 1998 Letter Agreement is replete with language indicating that

MPC's debts to Millennium under the VPP Agreements not only continued in effect, but would

continue to accrue under the Letter Agreement.  For example,  the October 1998 Letter

Agreement repeatedly and expressly provides that "[a]ll expenses of the [Michigan Properties]

Manager and/or Millennium incurred to [operate and manage the Michigan Properties] shall be

funded by Millennium as *demand obligations*."  October 1998 Letter Agreement at 2 (emphasis

added).  "Demand obligations," under the Letter Agreement[5] and the VPP Agreements, refers to

---

[5]     The Letter Agreement provides that any term not defined therein, which would include the term "demand obligation," is given the meaning set out in the VPP Agreements.  October 1998 Letter Agreement at 4.

costs incurred by Millennium to manage, operate or administer the Michigan Properties (as a result of MPC's failure to meet its obligations to do so) which MPC is required to repay to Millennium with interest. *See* Exs. 1-29 to Defs.' Br. in Support of Mot. for Partial Summ. J. (Doc. 105), Ex. 5 (Gas and Oil Production Payment Conveyances), § 5.1(a). The October 1998 Letter Agreement granted MPC the right to verify the accuracy of its ongoing obligations to Millennium by requiring Millennium to provide MPC with monthly reports "indicating the current status of the VPP, including the amounts of the Make Whole Balance and the demand obligations." *Id.* at 4.

The Letter Agreement further provided that Millennium would retain the right to operate the Properties until Millennium had recovered all of the volumes to which it was entitled under the VPPs, including "volumes necessary to reduce the 'Make Whole Balance' and the demand obligations to zero." *Id.* at 1. In the same vein, it granted Millennium the right to sell the Properties, with the proceeds of such sale to be "allocated so that Millennium shall be made whole for all amounts that would have been due under the VPPs." *Id.* at 3. The Letter Agreement also emphasizes that it, together with the VPP Agreements and related documents, constitutes the parties' entire agreement. *Id.* at 4.

Read as a whole, therefore, it is clear that the parties' intent in entering into the October 1998 Letter Agreement was to provide a mechanism by which Millennium might recover the oil and gas production and monies MPC owed it under the VPP Agreements, including the past and future costs of operating and managing the Michigan Properties that MPC had proved unable to fund itself as required by the VPP Agreements. This intent is fundamentally at odds with the Plaintiffs' position that October 1998 Letter Agreement served to extinguish MPC's VPP-related debts to Millennium.

Plaintiffs next refer to the April 1999 Letter Agreement in support of their position. This subsequent Letter Agreement, they argue, should be construed as part of the October 1998 Letter Agreement and, when read in conjunction the earlier letter agreement, demonstrates the parties' intent that all of MPC's debt to Millennium under the VPP Agreements be extinguished. I disagree.

Plaintiffs' argument is founded on the following statement in the April 1999 Letter Agreement: "Millennium will assume and fund all of the MPC liabilities described on the attached Exhibit." April 1999 Letter Agreement at 1. No exhibit, however, is attached to the Letter Agreement as executed by the parties. Plaintiffs argue this omission was an oversight and assert that an exhibit MPC prepared and attached to a previous draft of the agreement should be considered part of the final Letter Agreement executed by the parties. *See* Ps' Ex. 14 to Immel Ex. at EAC 002488. This draft Exhibit, titled "Liabilities to Be Assumed and Paid by WESCO," includes as one of the enumerated items "Balances due Williams Energy Services Company/Millennium including: Volumetric Production Payment, Keep Whole Balance under the Volumetric Production Payment, Demand Obligation." *Id.*

At best, this contract language, combined with the absence of the referenced Exhibit, creates an ambiguity regarding the MPC liabilities Millennium agreed to assume and fund pursuant to the April 1999 Letter Agreement. As a result, evidence extrinsic to the parties' written agreements may be considered to determine their intent on this issue. *See Prudential*, 959 P.2d at 594.

Plaintiffs contend this extrinsic evidence demonstrates not only that the parties intended to include MPC's debts under the VPP Agreements on the list of MPC liabilities to be

"assume[d] and fund[ed]" by Millennium, but, further, that MPC's debts to Millennium would be released, discharged or otherwise extinguished by virtue of their inclusion on this list.[6]

Before turning to the extrinsic evidence, the entire April 1999 Letter Agreement, as opposed to the statement singled out by Plaintiffs, must be considered. This Agreement expressly provides that all of its terms and conditions, including the "assume and fund" language relied upon by Plaintiffs, are agreed and accepted by the parties "in accordance with the terms and conditions of the October 13, 1998 Letter Agreement."[7] As described above, the October agreement did not extinguish MPC's debts and obligations under the VPP Agreements but rather expressly carried them forward as demand obligations to be paid by MPC to Millennium. In fact, the parties confirmed in the April 1999 Letter Agreement that this was their intent by reiterating there that the October 1998 Letter Agreement "provides that all expenses of the Manager shall be funded by Millennium as demand obligations."[8] April 1999 Letter Agreement

---

[6]    Plaintiffs provide no authority for the notion, implicit in their argument, that an agreement to "assume and fund" another's debt is the legal equivalent of an agreement to release, discharge or otherwise extinguish this debt.

[7]    The paragraph in the April 1999 Letter Agreement including the "assume and fund" language relied upon by Plaintiffs also specifically references and relies upon the October 1998 Letter Agreement. It states:

  "Millennium will assume and fund all of the MPC liabilities described on the attached Exhibit and will continue to deliver the $75,000 "Special Payment" to Energy Acquisition Corp. ("EAC") through June 30, 1999 *as provided for in the October 13, 1998 Letter Agreement between the parties.*" (emphasis added).

[8]    To the extent Plaintiffs argue the April 1999 Letter Agreement was intended to modify the October 1997 Letter Agreement to extinguish MPC's debts to Millennium, this contention is not supported by the plain language of the April Agreement or by the separate consideration that would be required to add this term. *See Watt Plumbing, Air Conditioning & Elec., Inc. v. Tulsa Rig, Reel & Mfg. Co.*, 533 P.2d 980, 983 (Okla. 1975). In all material respects, the April agreement merely confirmed the promises set forth in the October 1998 Letter Agreement, which is not sufficient to supply consideration for additional contract terms. *See Mid-Continent Petroleum Corp. v. Wilhoit*, 270 P.2d 645, 646 (Okla. 1954) (performance or promise to perform a duty which promisor is already legally bound to perform is not sufficient consideration).

at 1. Thus, the April 1999 Agreement, considered as a whole, does not support Plaintiffs' debt extinguishment theory and, in fact, strongly contradicts it.

The undisputed extrinsic evidence regarding the parties' negotiations after October 1998 and the missing Exhibit is no more helpful to Plaintiffs' position. Plaintiffs report that the Exhibit they rely on originates from a document prepared by an MPC representative in the weeks after the parties entered into the October 1998 Letter Agreement. This document, stamped "draft," was part of the parties' ultimately unsuccessful attempt to enter into a more comprehensive or definitive agreement to supersede the October 1998 Letter Agreement.[9] This MPC-generated draft document is titled "Liabilities to Be Assumed and Paid by SP, LLC," and includes as one of the eleven enumerated items "Balances due Williams Energy Services Company including: Volumetric Production Payment. Keep Whole Balance under Volumetric Production Payment. Demand Obligation." Immel Aff. (Doc. 100), Ex. 6.

Shortly after it drafted this document, MPC conveyed it to Millennium. In a subsequent internal review memoranda, Millennium representative Nancy Toben reported to Millennium's manager, Jeff Gutman, that she had questions and concerns regarding the contents of the document. In deposition, Toben testified that one of these concerns was the inclusion of the balances due from MPC to Millennium under the VPP Agreements. She further testified that the purpose of the document, from Millennium's perspective, was merely to identify the types and amounts of MPC debts Millennium was going to need to fund in operating the Michigan Properties and the mechanics for paying these debts.

---

[9]     At oral argument, Plaintiffs suggested that the April 1999 Letter Agreement is the more comprehensive agreement the parties at one point contemplated. This suggestion finds no support in the record, and is contradicted by a comparison of the one-and-half page April 1999 Letter Agreement and the longer and much more detailed October 1998 Letter Agreement, as well as consideration of the extrinsic evidence regarding the genesis of the April 1999 Letter Agreement.

At approximately the same time that it was reviewing MPC's proposed list of liabilities "to be assumed and funded" by Millennium, Millennium's Gutman received a letter from EAC regarding other aspects of the potential comprehensive agreement. In that letter, Mr. Immel, on behalf of EAC, asserted that EAC's financial reporting obligations under the VPP and related agreements should be waived in the new agreement because EAC and its affiliated companies "will be effectively terminating our lending relationship with Millennium" and "will not have any on-going [sic] financial obligations due to Millennium and/or [Williams] after this transaction." Immel Aff. (Doc. 100), Ex. 7 (Nov. 10, 1998 Letter from D. Immel to J. Gutman). Millennium rejected both this waiver proposal and its rationale, stating that under the contemplated future agreement "EAC/MPC will still have an on-going [sic] financial obligation to Millennium, as the VPP and related documents will still remain in effect and an integral part of the agreement." *Id.*, Ex. 8 (Nov. 17, 1998 Letter from J. Gutman to D. Immel) at 2. Millennium also reiterated that it was "prepared to pay the expenses associated with the VPP properties [i.e., Michigan Properties], through the demand obligation, as outlined in the October 13, 1998 Letter Agreement." *Id.*

In March of the following year, Millennium conveyed to MPC a draft document by which MPC would identify and warrant to all "Gas Sale, Transportation, Processing or Marketing Agreements or Assignments" to which it was committed for oil and gas wells it owned or operated. One of the twenty enumerated agreements was the VPP Agreements. In a cover letter, Ms. Toben to MPC, on behalf of Millennium, reported that this list of agreements concerning the Michigan Properties was one of numerous draft exhibits Millennium was beginning to compile in connection with preparing documentation that would "release" MPC from its obligations under the VPP Agreements. Immel Aff. (Doc. 100), Ex. 11. Although Toben did not specify in her letter whether she was referring to MPC's ownership and

operational obligations under the VPP Agreements or all of MPC's VPP-related obligations, the nature of the attached draft schedule and additional correspondence from Toben that same day suggests she was referring only to MPC's ownership and operational obligations under these agreements.[10] The draft schedule Toben prepared and transmitted in her March 22, 1999 correspondence also bears little resemblance, in content or form, to the draft Exhibit MPC prepared immediately after the October 1998 Letter Agreement or the Exhibit Plaintiffs claim should have been attached to the April 1999 Letter Agreement.

On March 23, MPC responded to Toben's correspondence by, among other things, forwarding to Tobin "a list of liabilities to be released by Millennium and/or assumed by SPV, LLC in addition to the VPP." The MPC-drafted list, titled "Liabilities to be Assumed and Paid by SPV, LLC," is a revised version of MPC's original list of liabilities to be assumed, and again includes "Balances due Williams Energy Services Company/Millennium" as one of the listed items. Immel Aff. (Doc. 100), Ex. 12. MPC acknowledged in this correspondence that "[t]he release/assumption of these liabilities need [sic] to be formally documented." *Id.*

A few days later, as it prepared to transfer operation of the Michigan Properties from MPC to a new manager, Millennium requested that MPC confirm in writing that the October 1998 Letter Agreement granted Millennium the exclusive authority to arrange for the operation, management, administration and/or sale of the Michigan Properties, including the right to appoint the new manager. The proposed letter agreement Millennium transmitted to MPC at this time also noted that the October 1998 Letter Agreement "provides that all expenses of the Manager shall be funded by Millennium as demand obligations." Defs.' Resp. to Pls.'

---

[10] In this additional correspondence, Ms. Toben addressed issues relating to the transfer of these ownership and operational obligations from MPC to SPV, LLC pursuant to the October 1998 Letter Agreement. *See id.*, Ex. 10.

Mot. for Partial Summ. J. (Doc. 113), Ex. F (March 26, 1999 Letter from J. Gutman to D. Immel).

On March 31, MPC responded with its own proposed letter agreement, in which it dropped any reference to Millennium paying expenses as demand obligations and added the statement that "Williams/Millennium will assume and fund all of the MPC liabilities previously disclosed to Williams on the enclosed Exhibit." Immel Aff. (Doc. 100), Ex. 13 (March 31, 1999 Letter from D. Immel to J. Gutman) at 1. The Exhibit attached to MPC's March 31 proposal is the same list of MPC liabilities, including the demand obligation and other balances due under the VPP Agreements, MPC had provided to Ms. Toben a week earlier.

The following day, Millennium revised MPC's proposed letter agreement to, among other things, reinsert the statement that expenses funded by Millennium under the October 1998 Letter Agreement were demand obligations. It did not change MPC's statement that Millennium would "assume and fund" the MPC liabilities described on an attached exhibit. Millennium then signed the revised letter agreement and forwarded it, without attaching an exhibit, for MPC's signature. MPC signed the letter agreement as revised by Millennium. This document is the April 1999 Letter Agreement.

Following execution of the April 1999 Letter Agreement, it is undisputed that Millennium continued to provide MPC with regular statements of the demand obligations accruing under the October 1998 Letter Agreement and VPP Agreements. Plaintiffs have not directed me to any pre-litigation evidence in the record in which they disputed their continuing liability for these demand obligations.

Viewing all of this and the other evidence of record in the light most favorable to Defendants, as required for consideration of Plaintiffs' Motion for Partial Summary Judgment, there is no question that the evidence of record is such that a reasonable jury could find in

Defendants' favor and reject Plaintiffs' claim that the parties agreed in the October 1998 and April 1999 Letter Agreements to extinguish MPC's debts to Millennium. This is sufficient to defeat Plaintiffs' motion for partial summary judgment on this claim and against Defendants' breach of contract claims. *See, e.g.*, *Lawmaster*, 125 F.3d at 1347 (where evidence is sufficient for a reasonable jury to find in the nonmovant's favor, then genuine issues of material fact exist).

When considering Defendants' cross-motion for summary judgment on these claims, I must change my perspective to view the evidence in the light most favorable to Plaintiffs. *See Pirkheim*, 229 F.3d at 1010. Based on this review, I conclude that Plaintiffs have failed to present sufficient evidence to create a genuine issue of material fact on the question of whether the parties intended to release, discharge or extinguish MPC's VPP-related debts through the October 1998 and/or April 1999 Letter Agreements. There is simply no evidence that Millennium and MPC ever had a meeting of the minds concerning the content of the omitted Exhibit to the April 1999 Letter Agreement or, more importantly, that Millennium intended this Exhibit or the "assume and fund" language in the April 1999 Letter Agreement to release, discharge or otherwise extinguish MPC's debt to it under the VPP Agreements. To the contrary, the evidence of record indicates Millennium did not intend this provision to do anything more than identify the MPC obligations that Millennium would "assume and fund" as demand obligations to be repaid by MPC pursuant to the October 1998 Letter Agreement and the VPP Agreements.

The only evidence that might support Plaintiffs' position that Millennium intended and agreed to extinguish MPC's debts to it through the two Letter Agreements is the single reference in Ms. Tobin's March 22, 1999 letter to a "release" of MPC's obligations under the VPP Agreements. Even viewed in the light most favorable to Plaintiffs, this reference constitutes a mere scintilla of evidence in support of Plaintiffs' position, and is insufficient as a

matter of law for a reasonable jury to find that the parties mutually agreed in the October 1998 and/or April 1999 Letter Agreements to extinguish MPC's debts to Millennium. Accordingly, no issue of material fact exists on this issue, and Millennium is entitled to summary judgment against Plaintiffs' claims and defenses based on the alleged extinguishment of MPC's debts under the VPP Agreements.

B.      Breach of the Credit Agreement and Promissory Note

MPC and MEI do not dispute that they breached the Credit Agreement and Promissory Note, but argue they cannot be found liable for this breach because the Escrow Agreement, and hence the Credit Agreement and Promissory Note, terminated as a result of Millennium's alleged assumption and extinguishment of all of MPC's VPP-related obligations. The logic behind this termination argument is suspect, but fails in any event as a result of my determination that Defendants are entitled to summary judgment on Plaintiffs' theory that Millennium agreed to release, discharge or otherwise extinguish the debt MPC owes it under the VPP Agreements. Defendants are, therefore, entitled to summary judgment on their claims against MPC and MEI for breach of the Credit Agreement and Promissory Note.

C.      Breach of the Performance Guaranty

Plaintiffs also contend that Millennium's alleged release of MPC's debts to it relieved EAC and MEC of their obligation under the Performance Guaranty to pay MPC's VPP-related debts. This argument would fail even if Plaintiffs were correct that Millennium had agreed to release MPC from these debts, as the Performance Guaranty plainly states that EAC's and MEC's guaranty is not affected by any act or omission Millennium might take with respect to MPC and its obligations under the VPP Agreements. Defendants are, therefore, entitled to summary judgment on their claim against EAC and MEC for breach of the Performance Guaranty.

II.     Claims Relating to the Hartland Transaction

In Plaintiffs' Fifth Claim for Relief, MEI alleges Millennium and Williams, as Millennium's agent, tortiously interfered with its contracts and prospective business relations with Dominion/Wolverine and Midcoast by refusing to release the Rood and Nyman mortgage when MEI and EAC were attempting to close the Hartland Transaction. Millennium and Williams have moved for summary judgment against this claim and for their corresponding claim for declaratory judgment.

To prevail on a claim for tortious interference with contract or with prospective business relations, MEI must establish, among other things, that the claimed interference was "unlawful" or "improper."[11] *Nat'l Ass'n of Professional Baseball Leagues, Inc. v. Very Minor Leagues*, 223 F.3d 1143, 1150 (10th Cir. 2000) (applying Oklahoma law); *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 858 (10th Cir. 1999) (applying Colorado law). If the act alleged to have caused the interference is conduct in which the actor has the legal right to engage, then this element cannot be proved. *See Chouteau v. Enid Memorial Hosp.*, 992 F.2d 1106, 1108 (10th Cir. 1993) (Oklahoma law); *Caven v. Amer. Fed. Sav. & Loan Ass'n of Colorado*, 837 F.2d 427, 431 (10th Cir. 1988) (Colorado law); *see also* Restatement (Second) of Torts § 773 (1979) (one who in good faith asserts a legally protected interest does not improperly interfere with another's contract or prospective business advantage even if the actor knows his conduct will cause a third party to break a contract or refuse to do business with the other). A failure of proof on this essential element renders all other facts immaterial. *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1213 (10th Cir. 2000).

---

[11]     Defendants assert without contradiction that this claim is governed by either Oklahoma law, the law designated in the underlying Escrow Agreement and Credit Agreement, or by Colorado law. There is no material difference between the law of these jurisdictions on the relevant issues here, as demonstrated by the citations above.

Defendants asserts that MEI cannot prove this element of its tortious interference claim because, under the undisputed facts, Millennium, acting on its own behalf or through its representative Williams, had the contractual right pursuant to the Credit Agreement to hold the Rood and Nyman mortgage. MEI does not dispute that the Credit Agreement granted Millennium this right, but argues that a genuine issue of fact exists as to whether the Credit Agreement had terminated at the time Millennium refused to release the Mortgage to facilitate the Hartford Transaction. The question presented, therefore, is whether, viewing all the evidence in the light most favorable to MEI, a reasonable jury could find that the Credit Agreement had terminated at the time Millennium declined to release the Mortgage.[12]

The Credit Agreement provided that it would terminate, and the mortgage would be released, either when no obligations remained owing under the Credit Agreement or when the Escrow Agreement terminated pursuant to its terms. The Escrow Agreement provided it would terminate in three specific circumstances: (1) upon joint written notification of termination by Millennium (by assignment from Williams) and MPC; (2) upon completion of the Claybanks Extension, to the sole reasonable satisfaction of Millennium, and elimination of certain debts owing from MPC; or (3) "upon MPC's showing to [Millennium], in form and substance satisfactory to [Millennium] in its sole reasonable judgment, that MPC had obtained alternate means to fully finance construction" of the Claybanks Extension and full satisfaction of certain

---

[12]     Because I find this issue dispositive, I do not consider Defendants' additional arguments that they are entitled to summary judgment on MEI's tortious interference claim because MEI cannot prove that Millennium's action caused Midcoast to withdraw from the transaction or that there is a link between the claimed interference and the claimed damages.

debts owing from MPC.[13] Exs. 1-29 to Defs.' Br. in Support of Mot. for Partial Summ. J. (Doc. 105), Ex. 13 [hereinafter "Escrow Agreement"], ¶ 3.

In their July 29 notice to Millennium seeking release of the Rood and Nyman mortgage, MPC and MEI asserted the Credit Agreement had terminated on the first basis, that no obligations under the Credit Agreement were then owing. It is undisputed, however, that neither MPC nor MEI had repaid the amounts borrowed from the escrow account pursuant to the Credit Agreement as of the date of this notice and that they were, in fact, in default of the Agreement and the related Promissory Note at that time. Accordingly, Millennium had no obligation to release the mortgage, the security it held for this loan, because of termination of the Credit Agreement on this basis.

Plaintiffs now argue that the Credit Agreement actually terminated because the separate Escrow Agreement had terminated on its own terms sometime in July or early August 1998, as a result of EAC having presented "an alternative means of financing" construction of the Claybanks Extension. This alternative means, according to Plaintiffs, is that, as of August 4, 1998, the funds remaining in the escrow account for construction of the Claybanks Extension were sufficient to pay the remaining construction costs it estimated for the project. Millennium's refusal to accept this "alternative" financing and terminate the Escrow Agreement was, Plaintiffs

---

[13]    In response to a question posed by the Court, the parties addressed whether a February 10, 1998 letter agreement between MPC and Millennium modified the Escrow Agreement by providing that it would also terminate upon Millennium's receipt "of an executed turn-key contract to construct the Claybanks surface facilities and gathering lines for a fixed amount not to exceed $3 million." Exs. 30-90 to Defs.' Br. in Support of Partial Summ. J. (Doc. 106), Ex. 83 at 2. Upon considering the parties' arguments, I am not persuaded that the February 10 letter agreement created an additional means of terminating the Escrow Agreement, as the letter agreement merely states that satisfaction of this requirement will result in the release of the "balance of the escrow account which *exceeds the total construction cost stated in the aforementioned contract*." *Id.* (emphasis added). Moreover, even if this provision could be read as requiring the release of all funds in the escrow account and, even further, termination of the Escrow Agreement itself and release of collateral, it is undisputed that Plaintiffs never delivered the required "executed turn-key contract" to Millennium.

assert, unreasonable in light of these estimates. As a result, Plaintiffs argue a genuine issue of fact exists as to whether the Escrow Agreement terminated on the basis of this alternative financing, and hence on whether Millennium was obligated to release the Rood and Nyman mortgage to allow the original or restructured Hartland Transaction to proceed.

There are numerous flaws in this theory, the most fundamental of which is Plaintiffs' assumption that this funding mechanism constituted "an alternate means" to finance construction of the Claybanks Extension within the meaning of the Escrow Agreement's termination provision. The plain meaning of "alternate means" in this provision is some means to finance construction of the Claybanks Extension other than what was provided in the Escrow Agreement. The Escrow Agreement provides for these construction costs to be financed by drawing from the funds placed in the escrow account for this purpose. *See* Escrow Agreement, at 1, ¶ 4. That the balance in the escrow account as of the late July or August, 1998, might have been sufficient to cover the then estimated remaining costs of this construction is not, therefore, as a matter of law, an "alternate means" of financing construction of the Claybanks Extension, because it is precisely the funding mechanism provided for in the Escrow Agreement.[14]

Accordingly, viewing the evidence in the light most favorable to Plaintiffs, there is no basis in the record before me on which a reasonable jury could find that the Escrow Agreement, and with it the Credit Agreement, terminated before Millennium's decision in late July and early August 1998 not to release the Rood and Nyman mortgage. As a result, it is undisputed that Millennium had a contractual right at that time to hold the mortgage pursuant to the Credit Agreement. Under the applicable law, therefore, Millennium's refusal to release its security

---

[14] This determination alone defeats Plaintiffs' argument that the Escrow Agreement terminated on the basis of MEI's and MPC's presentation of an "alternate means" of financing construction of the Claybanks Extension and renders immaterial the parties' factual disputes regarding the reasonableness, reliability and timing of the construction cost estimates upon which Plaintiffs rely in asserting termination on this basis.

interest was neither unlawful nor improper.  Because MEI cannot prevail on its claim of tortious interference with contract or prospective business relations against Millennium and Williams without proof of this element, Millennium and Williams are entitled to summary judgment on this claim.

III.    Claims Against Williams

Finally, Williams seek summary judgment on the claims against it.  Plaintiffs' Third Amended Complaint asserts a single claim against Williams, for tortious interference with contract or prospective business relations in connection with the failed Hartland Transaction. Williams was not a party to the Credit Agreement or the Rood and Nyman mortgage that gave rise to this controversy, but did act as Millennium's manager and representative when the company refused to release the mortgage.  Even assuming Williams could be held liable for tortious interference on this basis, Williams is entitled to summary judgment on this claim for the reasons stated in the preceding section.

## Conclusion

For the reasons stated above, I deny Plaintiffs' Motion for Partial Summary Judgment Re Assumption of VPP Debts (Doc. 95) and grant Defendants' Motion for Partial Summary Judgment (Doc. 103).  Pursuant to these rulings, summary judgment shall be entered for Defendants and against Plaintiffs on Plaintiffs' Fourth Claim for Relief (Declaratory Judgment/Assumption of VPP Debt) and Fifth Claim for Relief (Tortious Interference with Contract/Hartland), Defendants' First through Fifth Counterclaims (Breach of Contract), Defendants' Eleventh Counterclaim (Declaratory Judgment - Hartland Project) and any affirmative defenses that are premised on the claims and issues decided herein.  In addition, Plaintiffs' Eighth Claim for Relief (Recission) is dismissed as a result of Plaintiffs' withdrawal of this claim in response to Defendants' motion for partial summary judgment.

IT IS SO ORDERED.

Dated this 30th day of March, 2009.

s/John L. Kane
John L. Kane, Senior District Judge
United States District Court